UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-11093-RGS

SYLVIA L. TOLENTINO

v.

MICHAEL J. ASTRUE, COMMISSIONER
SOCIAL SECURITY ADMINISTRATION

MEMORANDUM AND ORDER ON
APPELLANT'S MOTION TO REVERSE
AND APPELLEE'S MOTION TO AFFIRM
THE DECISION OF THE COMMISSIONER

April 21, 2010

STEARNS, D.J.

Sylvia Tolentino is appealing the decision of the Commissioner of Social Security

that she is not a disabled person under the implementing regulations of the Social Security

Act.  See 20 C.F.R. § 404.1520.  The issue on appeal is whether substantial evidence

supports the Commissioner's decision that Tolentino is able to perform light duty work

despite her physical and mental impairments.  The appeal is brought pursuant to 42 U.S.C.

§ 405(g).[1]  A hearing was held on April 9, 2010.

BACKGROUND

Tolentino applied for Social Security Disability Insurance (SSDI) Benefits on January

4, 2008, and for Supplemental Social Security Income (SSI) Benefits on January 14, 2008.

She claimed permanent disability as of January 1, 2005, resulting from a combination of

back pain and depression.  On November 25, 2008, ALJ Stephen C. Fulton heard

---

[1]The Administrative Law Judge's (ALJ) decision was selected for review by the
Decision Review Board (DRB), but the ALJ's decision became final when the DRB did not
act within the allotted ninety days.  20 C.F.R. § 405.420(a)(2).

testimony from Tolentino (who was assisted by a non-attorney representative), and from a vocational expert.  A Spanish interpreter was also present.  On January 22, 2009, the ALJ issued his decision, finding that Tolentino could "perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she may occasional[ly] climb using ropes, ladders, or scaffolds."  Trial Record (Tr.) at 16-17.

Tolentino, a native of Puerto Rico, was forty years old on the date of the ALJ's decision.  She has an associate degree in secretarial services, and worked for four years as a secretary for a taxi service.  Tolentino has also been employed as a restaurant cashier, nighttime office cleaner, and carpenter's assistant.  In 2004, she was employed at a Burger King in Puerto Rico as a cook and counter attendant.  She injured her back at work when she slipped, fell, and had a rack collapse on her after she grabbed it in an attempt to regain her balance.  Tr. at 36-37.  She has not worked since.  In November of 2007, Tolentino moved to Massachusetts.[2]  At the time of the hearing, she was living in a Worcester, Massachusetts homeless shelter with her two teenage sons.

Physical Impairments[3]

Dr. Luis A. Romanirizarry was Tolentino's treating physician in Puerto Rico in 2004 and 2005.  He made the initial diagnosis of disability based on the following medical history. Tr. at 130.  In January of 2005, Tolentino was diagnosed with a lumbosacral sprain.  Tr. at

---

[2]Although Tolentino claimed other impairments (neck pain, ovarian cysts, vision impairment, asthma, and hypertension), they were found to be "non-severe" by the ALJ and are not at issue on appeal. Tr. at 13-14, citing 20 C.F.R. § 404.1521, *et seq.*; 20 C.F.R. § 416.921, *et seq.*

[3]The court has relied on English-language summaries of Tolentino's medical records for her physical impairments prior to her relocation from Puerto Rico to Massachusetts.  Tr. at 189-204.

13.  X-rays of her spine showed mild scoliosis.  Id.  A CT scan performed on April 8, 2005, showed "no gross disc herniation, central canal or neural foraminal stenosis. No significant degenerative changes of the facet joints."  Tr. at 197-198.  A further x-ray analysis in 2004 or 2005 mentioned "levo-scoliosis."  Tr. at 206.  Tolentino was administered multiple epidural steroid injections in 2006, and underwent three months of physical therapy. Tr. at 221, 292.  Tolentino found the injections effective for up to six months.  Tr. at 292.  The physical therapy was also helpful.  Tr. at 206, 238.  She was prescribed Naproxen (a pain medication) twice daily for one year following the slip and fall, but took lesser amounts because of the side effects.  Tr. at 219.  The record contains no information about Tolentino's medical history between 2006 and 2008.

On January 24, 2008, Tolentino visited the Family Health Center of Worcester complaining of back pain.  Tr. at 253.  She was again prescribed Naproxen twice daily as well as Flexeril (a muscle relaxant) up to three times daily as needed.  Id.

As part of her benefits application, on January 25, 2008, Tolentino completed a self-assessment of her residual functional capacity (RFC) in English without a translator's assistance.  Tolentino described her daily activities as brushing her teeth, doing chores, watching television, making lunch for herself and her sons, and taking her medications.  Tr. at 134-135.  She stated that the back pain had limited her activities of daily living (ADL), making it difficult to put on her pants and shoes, and to bathe her legs, feet, and back.  She required assistance to shave her legs, and had difficulty rising from a seated position.  Tr. at 135.  She also stated that the pain made sleep difficult.  Id.  Although she could clean windows and do laundry, she was unable to mop or sweep the floor by herself.  Tr. at 136.  She also testified that she could not perform tasks that required her to stoop or pick up

heavy objects.  Tr. at 137.  She used public transportation when necessary, but was limited in mobility by the pain in her right foot.  Id.  She also stated that she did not drive.[4]  Id. Tolentino was able to shop for groceries with her sons' assistance, and to manage her finances.  Id.  For leisure activities, she read books and watched television, but was unable to participate any longer in sports.[5]  Tr. at 138.  She attended Mass every Sunday.  Id.  She stated that her physical impairments affected her ability to lift, squat, bend, stand, reach, walk, kneel, climb stairs, and complete tasks.  Tr. at 139.  She described these limitations as, "[l]ift 10-15 pounds, reach not too high, have problem when squatting, walking just less than 1/4 mile, completing tasks because my back pain."  Id.  She reported no difficulty concentrating or following written or spoken instructions.  Id.  Nor did she report any problems interacting with authority figures, handling stress, or coping with changes in daily routine.  Tr. at 140.

On February 14, 2008, Tolentino presented to Dr. Ronald Jolda for a physical examination ordered by Disability Determination Services (DDS).[6]  Tr. at 205-210.  Dr. Jolda diagnosed Tolentino with mild lumbar muscle spasms and no evident scoliosis.  He also observed that she was limited in performing a straight leg raise test because of back pain.  Tr. at 208.  Dr. Jolda noted that Tolentino had no difficulty putting on her shoes and was able to squat to 85 percent, but that her back bothered her when she tried to bend

---

[4]Tolentino's testimony in the RFC self-assessment form about her ability to drive is inconsistent with other parts of the record.  Compare Tr. at 236, 283.

[5]At the time of her injury, Tolentino was a member of the Puerto Rican Olympic Martial Arts team.

[6]DDS is a program of the Massachusetts Rehabilitation Commission that is fully funded by the Social Security Administration (SSA) to determine the eligibility of Massachusetts applicants for SSDI and SSI.

down or lift heavy items. Tr. at 206. On February 26, 2008, a second DDS physician, Dr. Romany Hakeem Girgis, reviewed Tolentino's medical records and concurred with Dr. Jolda's findings. He found that Tolentino was capable of lifting up to twenty pounds occasionally, up to ten pounds frequently, and was able to sit, stand, or walk for up to six hours during an eight-hour workday. Tr. at 212. Dr. Girgis noted that Tolentino's ADLs were "partially compromised," but opined that "a light R.F.C. is reasonable for her back pain." Tr. at 213. He did not conduct an examination of Tolentino.

On February 26, 2008, Tolentino saw Dr. Rita Sadhu for treatment of her back pain. Tr. at 228. She reported her symptoms at the time as "stable," and that she coped with the pain by taking Motrin. Id. On March 28, 2008, Tolentino complained to Dr. Sadhu that the lower back pain had been radiating down her right leg for approximately one year. Tr. at 219, 233. Dr. Sadhu found Tolentino's range of motion (ROM) in her spine limited and noted a tenderness to palpation at the L4-L5 disc. Tr. at 233. On March 31, 2008, Tolentino was diagnosed by Dr. Paul Sabel, a radiologist, with "mild lumbar scoliosis" and "[s]traightening of lordosis which could denote muscle spasm" based on a set of x-rays ordered by Dr. Sadhu. Tr. at 224-225. Tolentino was prescribed Ibuprofen up to three times daily for pain as needed and was referred to physical therapy. Tr. at 219, 235.

Dr. Sadhu also completed a disability benefits form for Tolentino during the March 28, 2008 appointment. Dr. Sadhu found that Tolentino could sit or stand for a half-hour at a time and walk one to two blocks, but that she was unable to stoop or bend, and experienced pain in her shoulders and back when lifting any weight over ten pounds. Tr. at 235. Dr. Sadhu diagnosed Tolentino's condition as "chronic," but found "improvement expected based on the [medical] history and exam." Tr. at 234. Dr. Sadhu believed that

Tolentino was capable of performing certain ADLs independently (dressing, bathing, light housework, laundry, driving, using public transit, shopping, and work outside the home), but was incapable of doing others without assistance (sweeping or cleaning bathrooms). Tr. at 236.  During a follow-up appointment on April 30, 2008, Dr. Sadhu reported that Tolentino's "back pain seems to be getting worse," despite the taking of Ibuprofen three times daily.  Tr. at 254.

On May 9, 2008, Tolentino began a two-month physical therapy regimen at Dynamic Physical Therapy Services.  Tr. at 238-241.  Tolentino rated her back pain during activity as a ten (out of ten) at her intake evaluation.  Tr. at 239.  Her prognosis at the time was "[e]xcellent rehab potential to reach and maintain prior level of function."  Tr. at 238.  The short-term goals of the physical therapy were to increase lumbar ROM by 10-15 percent, increase lower extremity strength by one-half grade, and increase trunk strength by one-half grade.  Tr. at 239.  The long-term functional goals were to sit for one hour without pain, walk without pain, and perform all ADLs with no pain.  Tr. at 239.  At the halfway point of her physical therapy treatment (June 4, 2008), no change was noted in Tolentino's prognosis ("Moderate pain and limitation during and/or after a specific [instrumental ADL] affecting performance.").  Tr. at 271.  At her final session on July 3, 2008, Tolentino was said to have tolerated her treatment well and had reached all short-term goals and most of her long-term goals.  Tr. at 260.

On May 30, 2008, Dr. Robert McGan, a DDS physician, reviewed Tolentino's medical records to prepare an RFC assessment.  He did not conduct an examination of Tolentino.  The records included the examinations conducted by Dr. Sadhu and Tolentino's most recent x-rays.  Tr. at 245.  Dr. McGan agreed with Dr. Girgis that Tolentino was

capable of lifting up to twenty pounds occasionally, ten pounds frequently, and standing, walking, or sitting up to six hours during an eight-hour workday.  Id.  Dr. McGan further stated that Tolentino's Disability Report-Appeal Form "[n]otes no new allegations and thus would feel that light exertion is correct.  Credibility appears partial."  Id.  Dr. McGan also believed that his findings were not significantly different from those of Tolentino's treating physicians, including Dr. Sadhu.  Tr. at 250.[7]

On July 9, 2008, Tolentino was referred by Dr. Sadhu to Dr. Jennifer Kurz at UMass Memorial Medical Center.  Tr. at 254.  Tolentino reported to Dr. Kurz that the pain in her right leg seemed to "override the back pain."  Tr. at 292.  The pain became acute "with prolonged walking, sitting and driving."  Id.  Dr. Kurz found Tolentino's range of hip motion within normal limits, although the movement caused some pain in her lower back.  Id.  Dr. Kurz noted a positive straight leg test on Tolentino's right side.  Id.  Dr. Kurz diagnosed Tolentino with "right-sided lumbar radiculitis."  Id.  She recommended that Tolentino undergo lumbar epidural steroid injections.  Id.

On August 26, 2008, Dr. Christian Gonzalez, a pain management specialist at UMass Memorial Medical Center,  administered an epidural steroid injection to Tolentino at the L4-L5 interspace.  Tr. at 290.  Tolentino returned to Dr. Gonzalez on November 3, 2008, stating that the injection "did not help [her pain] at all," and that "she had no relief for

---

[7]On June 23, 2008, Disability Evaluation Services, a consulting division of UMass Medical School, determined that Tolentino had a "disability that is expected to last through: December 23, 2008" for purposes of the Emergency Aid to the Elderly, Disabled, and Children Program (EAEDC).  Tr. at 252.   EAEDC's disability standard is derived from regulations issued by the Massachusetts Department of Transitional Assistance rather than the SSA.  The standard is less strict than that required for Social Security benefits because an applicant is not required to show that she is totally disabled. See 106 CMR 320.200(A); 106 CMR 320.210.  See also Patricia Baker & Laura Gallant, Mass. Law Reform Inst., EAEDC Advocacy Guide 6 (2008).

any period of time." Tr. at 288.  Dr. Gonzalez reported that Tolentino "continues to have pain that starts in her low back and radiates into her right lower extremity."  Id.  Tolentino was instructed to continue on a prescription for Gabapentin (pain medication) and additionally prescribed Tramadol (pain medication) up to three times daily.  Id.  Tolentino was also scheduled to receive another epidural injection.  Id.  Based on his treatment of Tolentino, Dr. Gonzalez opined that "Ms. Tolentino's back injuries complicate her ability to lift weight in the amount of 5 lbs.  I believe that Ms. Tolentino's condition at this time is such that she cannot sustain permanent employment."  Tr. at 308.

Mental Impairment

Tolentino has a history of depression beginning when "as a young child, she often went to her room, closed the door, turned off the lights and cried."  Tr. at 283.  At the age of fifteen, Tolentino attempted suicide.  Tr. at 39.  She made a second attempt on September 29, 2006, following her work injury.  Tr. at 39, 283.  After, Tolentino was immediately hospitalized for psychiatric observation.[8]  Tr. at 309-313.  She was diagnosed by Dr. Ramón Fernández Marina, a psychiatrist, with depression, including homicidal and suicidal thoughts, and was accorded a Global Assessment Functioning (GAF) score of 40-51.[9]  Tr. at 313.  Tolentino was treated with Zyprexa (an anti-psychotic medication), Zoloft

---

[8]Although Dr. Susan Mascoop's report and Tolentino's brief refer to a "two-week" hospitalization, Tolentino agreed at the April 9, 2010 hearing that the hospitalization was more likely two or three days in duration.

[9]The GAF is a numeric scale (0 through 100) used by mental health clinicians and physicians to subjectively rate the social, occupational, and psychological functioning of adults.  The GAF score range between 41 and 50 is described as "[s]erious symptoms . . . OR any serious impairment in a social, occupational, or school functioning . . . ."  Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text rev. 2000) (DSM-IV-TR).

(an anti-depressant), and Restoril (for insomnia) during the hospital stay and was prescribed Buspar (an anti-anxiety medication) upon her release.  Tr. at 309.  Although Tolentino was referred to a psychologist for treatment after release, she did not seek further treatment despite continued thoughts of suicide because of personal embarrassment.  Tr. at 283, 285.

On October 3, 2008, Tolentino was evaluated by Dr. Susan Mascoop, a psychologist, in connection with her disability benefits appeal.  Dr. Mascoop reported the following symptoms: "feeling sad all the time, not expecting things to work out for her, seeing many failures in her past, getting very little pleasure from the things she used to enjoy, disappointed in herself, crying over every little thing, loss of most of her interest in other people, much greater difficulty making decisions that she used to, not having enough energy to do very much, sleeping much less than usual, significant increase in appetite, difficulty concentrating . . . pervasive feelings of hopelessness and that she feels like giving up."  Tr. at 285.  Tolentino "acknowledged suicidal thoughts but said she would not act on them [because of concern for her children]."  Id.  Based on these symptoms, Dr. Mascoop assessed Tolentino with a GAF score of 50.  Tr. at 287.  Dr. Mascoop opined that "Ms. Tolentino meets the SSA criteria for Affective Disorder-depressive syndrome . . . . [H]er symptoms of depression are of sufficient severity to where they would interfere with her ability to work.  Furthermore, it is my opinion that if Ms. Tolentino were to work, her employment would be brief and unsuccessful."  Id.

## THE ALJ'S DECISION

ALJ Fulton made the following pertinent written findings.

1.  The claimant meets the insured status requirements of the Social Security Act through March 31, 2009.

2.  The claimant has not engaged in substantial gainful activity since January 1, 2005, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: Lumbar strain with mild scoliosis status post epidural steroid injection and depression (20 CFR 404.1521 *et seq.* and 416.921 *et seq.*).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she may occasional[ly] climb using ropes, ladders, or scaffolds.  The claimant may occasionally stoop.  She should avoid concentrated exposure to hazards.  The claimant can understand and remember at least simple instructions.  She could concentrate for 2-hour periods over an 8-hour day on at least simple tasks.  The claimant can interact appropriately with co-workers and supervisors.  She can adapt to changes in the work setting.

6.  The claimant is capable of performing past relevant work as a secretary/office worker, fast food worker, office cleaner and cashier.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.  The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2005 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

Tr. at 12-23.

## DISCUSSION

Disability determinations follow the "sequential step analysis" mandated by 20 C.F.R.

§ 404.1520.  The ALJ must first determine whether a claimant was gainfully employed prior

to the onset of the disabling condition.  The ALJ must then determine whether the claimant

suffers from a severe impairment limiting her ability to work.  If the impairment is the same as, or equal in its effect to, an impairment (or combination of impairments) listed in Appendix 1 of Subpart P of the regulations, the claimant is presumed disabled.  If the impairment is not covered by Appendix 1, the fourth step of the analysis requires that the claimant prove her disability is sufficiently serious to preclude a return to her former occupation.  See Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 6-7 (1st Cir. 1982).  Only if she meets that burden is the Commissioner at the fifth step obligated to prove that there are other jobs in the national economy that she could nonetheless perform. See Gonzalez Perez v. Sec'y of Health, Educ. & Welfare, 572 F.2d 886, 888 (1st Cir. 1978).

The findings of the Commissioner are conclusive so long as they are supported by substantial evidence and so long as the Commissioner has applied the correct legal standard.  See 42 U.S.C. § 405(g); Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996).  "Substantial evidence . . . means evidence reasonably sufficient to support a conclusion.  Sufficiency, of course, does not disappear merely by reason of contradictory evidence. . . . [The] question [is] not which side [the court] believe[s] is right, but whether [the ALJ] had substantial evidentiary grounds for a reasonable decision . . . ."  Doyle v. Paul Revere Life Ins. Co., 144 F.3d 181, 184 (1st Cir. 1998).  The Commissioner's findings "are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

The ALJ found at Step 1 and 2 of the sequential step analysis that Tolentino had not been engaged in substantial gainful activity since January 1, 2005, and that she suffered

from the severe impairments of back pain and depression.  However, at Step 3, the ALJ found that these impairments, although severe, even in combination did not meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Steps 4 and 5 of the analysis require an assessment of a claimant's RFC.  See 20 C.F.R. § 404.1545(a)(5).  At Step 4, the ALJ found that Tolentino was capable of performing light work within limits, including her previous jobs as a secretary, fast food worker, office cleaner, and cashier.  Tr. at 16-17, 22.  On appeal, Tolentino asserts that the ALJ erred  at Step 4 when he found her capable of performing light work, and at Step 3 when he found her not to have a presumptive disability.

     I.    <u>Credibility of Tolentino</u>

As an initial matter, Tolentino argues that the ALJ improperly discounted her testimony in reaching his findings.  In his decision, the ALJ stated, "[a]fter careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are *not credible* to the extent they are inconsistent with [her RFC self-assessment form]."  Tr. at 18 (emphasis added).  While the ALJ must consider a claimant's subjective complaints of pain, he is not required to accept them at face value. <u>Avery v. Sec'y of Health & Human Servs.</u>, 797 F.2d 19, 22-23 (1st Cir. 1986); 20 C.F.R. § 404.1529.  He must, however, state specific reasons for questioning a claimant's credibility.  <u>DaRosa v. Sec'y of Health & Human Servs.</u>, 803 F.2d 24, 26 (1st Cir. 1986).[10]

_____

[10]"[A] Court will not save [a] decision by inserting the basis for a finding where there was not substantial evidence to support it and no specific finding justifying it as a rational result." <u>Rohrberg v. Apfel</u>, 26 F. Supp. 2d 303, 310 (D. Mass. 1998).

"In determining the severity of a claimant's pain, 'the absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility.'"  Makuch v. Halter, 170 F. Supp. 2d 117, 127 (D. Mass. 2001), quoting Social Security Ruling (SSR) 96-7p, Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, 1996 WL 374186, at *6 (S.S.A. July 2, 1996).  If after evaluating the objective findings, the ALJ determines that the claimant's reports of pain are significantly greater than what could be reasonably anticipated from the objective evidence, the ALJ must then consider other relevant information. Avery, 797 F.2d at 23. Considerations capable of substantiating subjective complaints of pain include evidence of:  (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness and side effects of any medication taken to alleviate the pain or other symptoms; and (5) any other factors relating to claimant's functional limitations and restrictions due to pain. Id. at 22; 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii), 416.929(c)(3)(i)-(vii).

    a.    Physical Impairments

Tolentino argues that the ALJ, in determining that her description of her physical impairments was not credible, "merely recited her testimony, then recited facts from the record, without explicitly comparing the two." Tolentino Br. at 14.  Tolentino argues that any apparent differences between her testimony and the objective medical evidence are not conclusive on the issue of her credibility.  See Bulpett v. Heckler, 617 F. Supp. 850, 857 (D. Mass. 1985) (subjective experience of pain must be considered even if objective medical evidence shows that an injury is mild).  Properly credited, Tolentino argues that her

testimony demonstrates that she is incapable of performing even light work.  She further contends that the ALJ ignored Dr. Sadhu's RFC assessments for the stated reason that Dr. Sadhu's opinions were based on Tolentino's self-report, while at the same time, the ALJ relied on Tolentino's written statements in making his credibility determination.

The Commissioner notes that, in concluding that Tolentino's complaints were exaggerated, the ALJ relied on more than a mere credibility finding.  The ALJ cited the absence of objective evidence (x-rays and CT scans) corroborating Tolentino's complaints, the "conservative" treatment that she had received, and her testimony regarding her daily routines.[11]  The court finds that the ALJ in this regard acted well within his discretion. Issues of credibility and the resolution of inconsistencies in the record are for the Commissioner and not the court to resolve.  Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).

    b.   <u>Mental Impairments</u>

Tolentino also contends that the ALJ improperly discounted her testimony regarding her mental impairments.  While the ALJ credited Tolentino's written RFC statements, he rejected her testimony at the hearing without explaining why it was less believable.  The Commissioner responds that the ALJ noted the dearth in the record of mental health treatment notes and prescriptions for psychiatric medicines.  Tolentino counters that the ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment" without first considering possible explanations.  SSR 96-7p, 1996 WL 374186, at *7.  Tolentino points to Dr.

---

[11]Tolentino blames inconsistencies between her written and oral testimony on the lack of assistance that she received in filling out the RFC forms.

Mascoop's notation about her embarrassment over her mental health issues. However, as the Commissioner notes, embarrassment is not a valid reason under the SSA regulations for avoiding medical treatment. <u>See</u> <u>id</u>. at *8. Again, the court finds that the ALJ acted within his discretion in questioning Tolentino's credibility on this issue.

II.   <u>The Step 4 Analysis</u>

Tolentino argues that at Step 4 the ALJ gave insufficient weight to the opinions of her treating physicians. Under the implementing regulations, the ALJ should ordinarily give "more weight" to treating physicians' opinions, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. § 404.1527(d)(2). The ALJ, however, is not *required* to give a treating physician's opinion *controlling* weight. <u>Arroyo v. Sec'y of Health & Human Servs.</u>, 932 F.2d 82, 89 (1st Cir. 1991); <u>Rodriguez Pagan v. Sec'y of Health & Human Servs.</u>, 819 F.2d 1, 4 (1st Cir. 1987). If the treating physician's opinion is inconsistent with other evidence in the record, the conflict is for the Commissioner – and not the court – to resolve. <u>Rodriguez</u>, 647 F.2d at 222. In making this determination, the Commissioner may defer to the opinion of an independent medical expert. <u>Keating v. Sec'y of Health & Human Servs.</u>, 848 F.2d 271, 275 n.1 (1st Cir. 1988).[12]

---

[12]Where the independent expert's opinion is not supported by specific medical findings, or where the expert's conclusion is inconsistent with the medically supported opinion of a treating physician, no deference is due. <u>See</u> <u>Berrios Lopez v. Sec'y of Health & Human Servs.</u>, 951 F.2d 427, 431 (1st Cir. 1991). Where the medical evidence is inadequate to support a reliable determination of disability, the ALJ has an affirmative obligation to insure that gaps in the record are filled. This is not a matter of discretion, but a duty imposed on the ALJ by the implementing regulations. <u>See</u> <u>White v. Barnhart</u>, 287

a.     Physical Impairments

Tolentino argues that the "ALJ willfully ignored and mischaracterized significant medical evidence favorable to [her] that represented the substantial weight of the overall record."  Tolentino Br. at 7.  With regard to her physical ailments, Tolentino emphasizes that none of the *examining* physicians opined that she was able to lift more than ten pounds.  Dr. Gonzalez stated that Tolentino's injuries complicated even the lifting of five pounds (consistent with Tolentino's testimony).   Dr. Sadhu found that Tolentino experienced pain whenever lifting over ten pounds.   The only doctors to determine otherwise were Drs. McGan and Girgis – the non-examining DDS physicians who presented brief remarks on standardized forms.  See Kratman v. Barnhart, 436 F. Supp. 2d 300, 310 (D. Mass. 2006) ("Reports from non-examining physicians that 'contain little more than brief conclusory statements or the mere checking of boxes . . . are entitled to relatively little weight.'" (quoting Berrios Lopez, 951 F.2d at 431)).  Tolentino faults the ALJ for not reconciling the inconsistencies between her treating physicians' opinions and those of  SSA's non-examining physicians. See id. at 305.

The Commissioner responds that controlling weight need only be given to a treating physician's opinion when it is well-supported and not inconsistent with the record evidence. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); SSR 96-2p, Giving Controlling Weight to Treating Source Medical Opinions, 1996 WL 374188, at *4 (S.S.A. July 2, 1996).  The ALJ also has the flexibility to adopt or reject all or part of a medical opinion based on the record evidence.  See SSR 96-2p, 1996 WL 374188, at *3.  Here, the ALJ found Dr. Gonzalez's opinion inconsistent with the earlier findings by examining physicians that Tolentino

---

F.3d 903, 908 (10th Cir. 2001).

suffered only "mild" back pain.  Similarly, Dr. Sadhu's opinions on Tolentino's limitations were inconsistent with the findings of other examining physicians (Drs. Jolda and Kurz).  Finally, the ALJ relied on the two DDS physicians (Drs. McGan and Girgis) who had reviewed Tolentino's medical records.

Tolentino argues that the DDS physicians' opinions should be discounted because not all of the available records were weighed.  Specifically, there is no mention in Dr. McGan's report that he reviewed Dr. Sadhu's April 20, 2008 treatment note stating that Tolentino's "back pain seems to be getting worse."  The Commissioner counters that the note is inconsistent with the medical record as a whole.  Shortly after the visit to Dr. Sadhu, Tolentino began an apparently successful regimen of physical therapy.  Tolentino accuses the ALJ of "ignoring and mischaracterizing relevant evidence from her physical therapy sessions" because he "depicted her physical therapy as improving her condition when in fact . . . [it] was unchanged . . . ."  Tolentino Br. at 11.  According to Tolentino, "[s]uch a gross distortion of the record indicates that the ALJ did not adequately consider all of the evidence."  Id.  The court disagrees.  Tolentino's physical therapists reported that she tolerated the treatment well and was able to reach all of her short-term goals and most of her long-term goals.  Tr. at 260.  Tolentino had also told her examining physicians and physical therapists that she had found the physical therapy that she had earlier received in Puerto Rico to have been beneficial.  Tr. at 206, 238.

Tolentino next argues that the ALJ did not apply the appropriate standard under the regulations for choosing a non-treating physician's opinions over those of a treating physician.  Specifically, Tolentino asserts that the ALJ was obligated to consider the factors listed at 20 C.F.R. § 404.1527(d)(2)-(6), in determining the weight to give to Dr. Gonzalez's

17

opinion, but instead "cursorily found [his] opinion deserving of little weight."[13]  Tolentino Br.

at 12.  The Commissioner responds that the ALJ is not required to explain why he did not

consider irrelevant factors.  According to the Commissioner, "Dr. Gonzalez's specialization

and treating relationship were trumped by the disparity between his treatment notes and

his assessment of Plaintiff's functional capacity."  Comm'r Br. at 13.  The ALJ also points

to the brief duration of Dr. Gonzalez's care of Tolentino (two visits).  According to the

Commissioner, the most relevant factor in the ALJ's analysis was "supportability," which

was addressed at length when the ALJ compared Dr. Gonzalez's opinion to the other

medical evidence.  The court agrees that the ALJ applied the appropriate standard in giving

Dr. Gonzalez's opinion less weight than would be accorded the "longitudinal view" of a

doctor who had a lengthy history of treating a patient.

> b.   Mental Impairments

Tolentino first notes that no evidence addressing her mental impairments exists in

the record outside of the evaluations performed by Dr. Marina and Dr. Mascoop.  Because

the ALJ decided not to credit these doctors, Tolentino argues that "the ALJ impermissibly

substituted his layman's opinion for the findings of a mental health professional."  Tolentino

Br. at 20.  The First Circuit has held in a case involving similar facts that "[a]bsent a residual

functional capacity assessment from an examining psychiatrist, we do not think the ALJ

was equipped to conclude that claimant's condition was so trivial as to impose no

---

[13]The factors include: length of the treatment relationship and frequency of examination; nature and extent of the treatment relationship; supportability by evidence; consistency with the record as a whole; whether the opinion is on issues within a relevant specialty; and other factors such as a doctor's familiarity with the disability standards.  20 C.F.R. § 404.1527(d)(2)-(6).

significant limitation on work." Rivera-Figueroa v. Sec'y of Health & Human Servs., 858 F.2d 48, 52 (1st Cir. 1988).

The Commissioner concedes that no contradictory mental health evaluations were presented by the SSA. However, the Commissioner argues that "the ALJ was not required to hunt for information on [Tolentino's] mental impairment." Comm'r Br. at 18. The Commissioner cites Nieves v. Sec'y of Health & Human Servs., 1995 WL 23132, at *1 (1st Cir. 1995), as an analogous case where "appellant presented no medical evidence of mental impairment nor did she or her counsel ever claim that a mental impairment had prevented her from being able to work." Nieves, however, is inapposite. In Nieves, there was no mental health impairment claim at all before the ALJ. Here, there were two evaluations by mental health experts in the record and a finding by the ALJ of depression as a severe impairment. In the face of this unrebuked medical evidence, the court agrees with Tolentino that it was inappropriate for the ALJ to rely on his own opinion regarding Tolentino's psychological state.[14]

III.    The Step 3 Analysis Lacked Substantial Evidence

---

[14]Even if the effect of the ALJ's discounting of Tolentino's credibility was to eliminate Dr. Mascoop's report from consideration, he still had an obligation to complete the record with a mental RFC assessment. See Perez v. Sec'y of Health & Human Servs., 958 F.2d 445, 446 (1st Cir. 1991) ("[W]here an ALJ reaches conclusions about claimant's physical exertional capacity without any assessment of residual functional capacity by a physician, the ALJ's conclusions are not supported by substantial evidence and it is necessary to remand for the taking of further functional evidence." (citing Rivera-Figueroa, 858 F.2d at 52)); Rivera-Torres v. Sec'y of Health & Human Servs., 837 F.2d 4, 6-7 (1st Cir. 1988) ("Where . . . there is no residual functional capacity evaluation . . . [and] the ALJ, a lay factfinder, lacks sufficient expertise . . . an explanation of claimant's functional capacity from a doctor is needed.").

Tolentino next argues that the ALJ committed reversible error at Step 3 when he concluded that "[n]o treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment."  Tr. at 15.

a.     Physical Impairments

 Section 101.04 of Appendix 1 details the criteria for a presumptive finding of disability of the spine with evidence of nerve root compression: (1) neuro-anatomic distribution of pain; (2) limitation of motion of the spine; (3) motor loss accompanied by sensor or reflex loss; and (4) positive straight-leg raising test.  20 C.F.R. Pt. 404, Subpt. P, App'x 1. Tolentino believes that she meets these criteria because:  (1) she and her treating physicians have described lower back pain radiating down into her lower extremities (Tr. at 206, 219, 233, 288, 292, 308); (2) her physicians and physical therapists described limited range of movement for her spine (Tr. at 219, 233, 238); (3) these same physicians and physical therapists have found impaired motor function (id.); and (4) there have been two findings of positive straight leg raises (Tr. at 208, 292).

The Commissioner counters that there was substantial evidence in the record allowing the ALJ to find that Tolentino did not meet the criteria for a presumptive disability. He points to the intermittent nature of Tolentino's pain (Tr. at 206, 219), a negative straight leg raise test on her left side (Tr. at 292), normal lumbar ROM (Tr. at 292), and no evidence of sensory or reflex loss (Tr. at 219, 254, 292).  Again, this was a dispute for the Commissioner to resolve.  Rodriguez, 647 F.2d at 222.

b.     Mental Impairments

Under section 12.04(B) of Appendix 1, for depression to qualify as a presumptive disability, a claimant's symptoms must include at least two of the following: marked

restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  20 C.F.R. Pt. 404, Subpt. P, App'x 1. Tolentino argues that "the ALJ ignored, selectively presented, and mischaracterized evidence from Dr. Mascoop's report, the psychiatric hospital records, and Ms. Tolentino's statements."  Tolentino Br. at 16.  Tolentino argues that the ALJ ignored her reported symptoms of difficulty in concentrating and making decisions, frequent crying, difficulty socializing with others, and extreme lightheadedness from the side effects from her medications.  The ALJ also never addressed the GAF score assessments of either Dr. Marina (41-50) or Dr. Mascoop (50).[15]  See Bickford v. Barnhart, 242 F. Supp. 2d 39, 43 (D. Me. 2002) (finding ALJ impermissibly dismissed the relevance of a GAF score of 50). Tolentino argues that the ALJ's Step 3 analysis in this regard was derived entirely from her self-completed RFC form.  See Bickford, 242 F. Supp. 2d at 43; 20 C.F.R. § 404.1527(d).[16]

With regard to Listing § 12.04(B), the Commissioner responds that Dr. Mascoop's findings were contradicted by other evidence in the record (in addition to Tolentino's written statements), and that it was up to the ALJ to resolve the conflicts.  Moreover, the Commissioner contends that Tolentino did not satisfy the prerequisites of Listing § 12.04(A)(1).  To meet these criteria, a claimant must show at least four of the following signs of depression: pervasive loss of interest, appetite disturbance, sleep disturbance,

---

[15]The court notes that Dr. Mascoop came to a GAF score in the same range as Dr. Marina without the benefit of Tolentino's medical records from Puerto Rico.

[16]Tolentino also notes that the ALJ's Step 3 determination omitted any reference to her two suicide attempts and suicidal ideation.  See Diaz v. Sec'y of Health & Human Servs., 791 F. Supp. 905, 912 (D.P.R. 1992).

psychomotor agitation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, thoughts of suicide, hallucinations, delusions, or paranoid thinking. 20 C.F.R. Pt. 404, Subpt. P, App'x 1.  Although the Commissioner concedes that each of these criteria are discussed in Dr. Mascoop's report, he argues that her findings are contradicted by the observations of Tolentino's examining physicians that she was properly oriented, cooperative, motivated, and in no acute distress.  See Burgos Lopez v. Sec'y of Health & Human Servs., 747 F.2d 37, 41 (1st Cir. 1984) (affirmance of ALJ's decision appropriate where a mental condition was not found disabling despite the observations of claimant's psychiatrist).

The Commissioner's argument is not, however, supported by the record.  The Commissioner relies on Dr. Jolda, Dr. Sadhu, and the various physical therapists' observations.  Dr. Jolda's examination, however, focused on Tolentino's back pain – the only disability he discussed.  Tr. at 205.  When Dr. Sadhu filled out the forms for EAEDC, she noted Tolentino's history of depression and her hospitalization for a suicide attempt, but refused to fill out the section on "Mental Functioning" because she had not conducted a mental evaluation.  Tr. at 233, 236.  The physical therapists similarly were not focused on mental health issues.  Finally, Burgos Lopez is inapposite because in that case several psychiatric opinions contradicted the claimant.  Here, the only two expert mental health evaluations support Tolentino's claim of depression.  As in the Step 4 analysis, the court finds that the ALJ inappropriately substituted his lay opinion of the state of Tolentino's mental health for those of her treating psychiatrist and psychologist.  See Rivera-Figueroa, 858 F.2d at 52.

IV.     The ALJ Did Not Consider Physical and Mental Impairments in Combination

22

The ALJ finally must consider the "combined effect of all of the claimant's impairments without regard to whether any such impairment, if considered separately, would be of such severity" to merit consideration.  42 U.S.C. § 423(d)(2)(B); McDonald v. Sec'y of Health & Human Servs., 795 F.2d 1118, 1126 (1st Cir. 1986).  See also Bulpett, 617 F. Supp. at 857 (the ALJ assessed three major impairments individually, but "made little effort to assess the combined effects of these physical problems on [claimant's] ability to perform gainful work").  Tolentino argues that "[n]owhere in the decision did the ALJ consider Ms. Tolentino's impairments in combination.  The ALJ evaluated each of her impairments separately to determine their severity, but never once asked whether they would constitute a severe impairment in combination."  Tolentino Br. at 25.

The Commissioner argues that "the ALJ did consider all of [Tolentino's] alleged impairments in combination."  Comm'r Br. at 18.  He points to the Step 4 analysis performed by the ALJ: "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable *impairments* could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  Tr. at 18 (emphasis added).  The court also notes that the ALJ's finding at Step 3 stated that Tolentino "does not have an impairment or *combination* of impairments that meets or medically equals one of the listed impairments."  Id. at 14 (emphasis added).  Although the ALJ's combination analysis might have been more detailed, the record makes clear that he did consider Tolentino's ailments in combination.

ORDER

23

For the foregoing reasons, Tolentino's motion to remand is <u>ALLOWED</u> for consideration and development of the record with respect to her possibly disabling mental impairment.  The Commissioner's cross-motion for an order of affirmance is <u>DENIED</u>.  The Clerk will remand the case to the Commissioner for further proceedings consistent with this opinion.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE